IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAROL W.,[1] | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 21 C 3484 ) ) Magistrate Judge Gabriel A. Fuentes |
| MARTIN J. O'MALLEY, Commissioner of Social Security,[2] | ) ) ) |
| Defendant. | ) ) |

**ORDER**[3]

Before the Court is Plaintiff Sharol W.'s memorandum seeking remand of the Administrative Law Judge's ("ALJ") opinion denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") (D.E. 19).

**I.      Procedural History**

Plaintiff applied for SSI and DIB on July 28, 2018, alleging she became disabled on January 10, 2008, based on bilateral carpal tunnel syndrome, Type 2 diabetes, spine disorders, kidney disease, blood disorders, hypertension and hyperlipidemia. R. 251. A hearing was held on

---

[1] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. To the extent the Court uses pronouns in this order, the Court uses those pronouns used by the parties in their memoranda.

[2] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security. Martin J. O'Malley Sworn in as Commissioner of Social Security Administration, available at https://blog.ssa.gov/martin-j-omalley-sworn-in-as-commissioner-of-social-security-administration/, last accessed Dec. 28, 2023. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. O'Malley is substituted for his predecessor, Kilolo Kijakazi, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On July 12, 2021, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 9.)

May 15, 2020, at which the Plaintiff and a vocational expert ("VE") testified before the ALJ, and Plaintiff requested a closed period of disability from January 10, 2018, through July 1, 2019. R. 77-123; 158. On June 16, 2020, the ALJ issued a ruling that the claimant was not disabled during that closed period and denied the request for benefits. R. 174. On November 24, 2020, the Appeals Council ("AC") vacated the hearing decision and remanded the case to the ALJ. R. 181. As relevant here, the AC ordered the ALJ to, "[i]f warranted, obtain supplemental evidence from a vocational expert" to determine if the claimant had acquired any transferable skills and to have the VE "identify examples of such appropriate jobs and to state the incidence of such jobs in the national economy." *Id.* A second hearing before the ALJ followed on March 11, 2021, where the Plaintiff again testified, as did a second VE. R. 47-76. On March 23, 2021, the ALJ again denied Plaintiff's application for benefits, finding her not disabled under the under the Social Security Act (the "Act"). (R. 30.)[4] This appeal followed.

## II. The ALJ Decision

The ALJ analyzed Plaintiff's claim using the Social Security Administration's ("SSA") five-step sequential evaluation process. The ALJ found at Step One that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 10, 2018. (R. 16.) At Step Two, the ALJ determined that Plaintiff had the severe impairments of bilateral carpal tunnel syndrome, mild lumbar spine degenerative disc disease, obesity, and diabetes mellitus. (*Id.*) At Step Three, the ALJ concluded that Plaintiff's impairments, alone or in combination, did not meet or medically equal the severity of one of the SSA's listed impairments. (R. 16-17.) The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work, with additional limitations: she could lift and/or carry up to 20 pound occasionally and 10 pounds

---

[4] The AC subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

frequently; had no limitations in her ability to sit, stand, or walk throughout an eight-hour workday; could occasionally climb ramps and stairs, ladders, ropes, or scaffolds; could perform fine and gross motor manipulation occasionally but not frequently, and was incapable of forceful grasping or torquing. (R. 17.) At Step Four, the ALJ concluded that Plaintiff was unable to perform her past relevant work. (R. 27.) At Step Five, the ALJ relied only on the testimony that VE Timothy Whitford provided during the first hearing to conclude that a significant number of jobs existed in the national economy that Plaintiff could perform given her age, education, work experience, and RFC, including the representative occupations of tanning salon attendant, DOT#359.567-014 (SVP 2 and light), with approximately 2,000 jobs in the national economy; furniture rental consultant, DOT#295.357-018 (SVP 2 and light), with approximately 10,000 jobs nationally; and counter clerk, DOT#249.366-010 (SVP 2 and light), with approximately 10,000 jobs in the national economy.

## III. Analysis

### A. Legal Standard

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (citations and quotations omitted). "An ALJ need not specifically address every piece of evidence, but must provide a logical bridge between the evidence and his conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023) (internal citations and quotations omitted). The claimant has the burden of proof

at Steps One through Four of the five-step sequential process for determining disability. *See Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). At Step Five, the burden of proof shifts to the Commissioner of Social Security to show that the claimant can adjust to other work existing in "a significant number of jobs … in the national economy." *See Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

Plaintiff challenges only the ALJ's assessment at Step Five that she is able to perform work existing in significant numbers in the national economy. To that end, the Plaintiff raises three arguments challenging the ALJ's determination: first, that the estimated 22,000 jobs that Plaintiff could perform does not represent a significant number of jobs in the national economy; second, that the ALJ did not properly address the Plaintiff's post-hearing objections regarding the VE's testimony; and third, that the ALJ's decision to credit the VE's testimony was not supported by substantial evidence. As explained below, the Court agrees with the third of these arguments and finds that the ALJ's acceptance of the VE's testimony as a basis for denying benefits was not supported by substantial evidence. In remanding on that ground, we do not address Plaintiff's other arguments.

### B. The Step Five Analysis

"In the context of job number estimates, substantial evidence requires the ALJ to ensure that the vocational expert's estimate is the product of a reliable methodology." *Ruenger v. Kijakazi*, 23 F.4th 760, 762 (7th Cir. 2022), citing *Brace*, 970 F.3d at 821-22. The VE's methodology is reliable when "it is based on 'well-accepted' sources" and when the VE explains that methodology "cogently and thoroughly." *Ruenger*, 23 F.4th at 762, citing *Biestek*, 139 S. Ct. at 1155. If the plaintiff challenges the VE's job-number estimate, it is the ALJ's responsibility to ensure the VE offers a "reasoned and principled" explanation of how the methodology used

4

produced the estimate provided. *Ruenger*, 23 F.4th at 762, citing *Chavez v. Berryhill*, 895 F.3d 962, 970 (7th Cir. 2018). The VE's explanation must instill confidence that the job number estimate was not "conjured out of whole cloth." *Ruenger*, 23 F.4th at 762, quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002).

Some additional context regarding Step Five is necessary here, and to provide that, the Court looks primarily to *Chavez* and *Ruenger*. Typically, the SSA approaches its burden at Step Five by approximating the "number of positions that exist, whether vacant or filled, and without regard to the location of work and a claimant's likelihood of being hired." *Chavez*, 895 F.3d at 964, citing 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.966(a). Similarly, the regulations specifically state that other factors that would affect the typical job seeker, such as "economic conditions or an employer's hiring practices, are not to affect five-step estimates of job numbers." *Id.* The regulations are purposely designed with these limitations so that the agency has a workable framework to approximate the availability of suitable alternative work that can be applied to the astronomical number of applications that it receives. *Id.*

In this case, the ALJ did what most ALJs do to determine a job number estimate at Step Five: He sought the assistance of a vocational expert to testify objectively regarding the exertional requirements of jobs and their availability in the national economy. *See Chavez*, 895 F.3d at 964, citing 20 C.F.R. § 419.966(e) (authorizing the use of VEs to assist at Step Five); *Ruenger,* 23 F.4th at 761. VEs often have master's degrees in vocational rehabilitation or psychology or work in the field of job placement, and they are supposed to testify objectively and impartially regarding the exertional requirements of jobs and their frequency of occurrence in the national economy. *Chavez*, 895 F.3d at 964, citing SOC. SEC. ADMIN., VOCATIONAL EXPERT HANDBOOKS, 9-10 (Aug. 2017). VEs are expected to be familiar with and use occupational information sources

produced by the Department of Labor, the Social Security Administration, the Census Bureau, and state employment studies. *Id*.

The SSA authorizes itself to "take administrative notice of reliable job information" from the *Dictionary of Occupational Titles* ("DOT") and other published sources. *Chavez*, 895 F.3d at 965, citing 20 C.F.R. § 416.966(d)(1). VEs typically rely on the DOT to determine jobs available in the national economy. The DOT was last updated in 1991, and SSA has been working since 2008 on project called the Occupational Information System ("OIS"), which promises a more up-to-date, accurate picture of the current economic and labor landscape. SOC. SEC. ADMIN., OCCUPATIONAL INFORMATION SYSTEM PROJECT FAQ'S, https://www.ssa.gov/disabilityresearch/ois_project_faqs.html (last visited November 20, 2023). There is currently no projected date for the finalization of this project. Courts, including this one, have "continue[d] to invite" this update to the DOT. *See, e.g.*, *Ruenger*, 23 F.4th at 762; *Thomas D. v. Kijakazi*, No. 20 C 2683, 2023 WL 2561614, at *10 (N.D. Ill. Mar. 17, 2023). The courts, and most importantly, Social Security claimants, continue to wait.

The DOT divides jobs into groups, and then further breaks down each group into particular job titles, based on job duties and requirements. So for example, the VE in this case submitted that Plaintiff could perform the position of furniture rental clerk, DOT 295.357-018 (R. 111). That particular job title is located in group number 295, "Rental Clerks," which includes 13 other occupations ranging from "safety deposit manager," DOT 295.137-010, to boat, airplane, baby stroller, and hospital television rental clerks.

The DOT does not provide an estimate of how many jobs in each of of those job titles exist in the national economy. *Chavez*, 895 F.3d at 965. Accordingly, to determine the number of jobs available, a VE must consult another source – commonly, the Bureau of Labor Statistics ("BLS,"

an agency of the Department of Labor) compilation of Occupational Employment Statistics ("OES"), which uses a different grouping system than the DOT called the Standard Occupational Classification ("SOC").[5] *Chavez*, 895 F.3d at 965. There is not a one-to-one correlation between these two sources, so when a VE identifies the number of jobs in an SOC code, that number roughly approximates how many positions are available within a DOT job group, but *not* within the specific DOT job title itself. *Ruenger*, 23 F.4th at 726, citing *Chavez*, 895 F.3d at 965-66. VEs use different methodologies to calculate the approximate number of jobs within a DOT group, including the equal distribution method, wherein the VE divides the number of jobs estimated for an SOC code by the number of DOT titles contained within the SOC code. *Ruenger*, 23 F.4th at 762.[6]

C. The VE's Testimony

In this case, the ALJ asked the VE to consider an individual with the claimant's age, education, and work experience who was capable of light level work, as defined by the regulations; who was not impaired in their ability to sit, stand, or walk throughout an eight-hour workday; who should no more than occasionally climb stairs or ladders; who could perform fine and gross

---

[5] The SOC is a "federal statistical standard used by federal agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data. All workers are classified into one of 867 detailed occupations according to their occupational definition." Standard Occupational Classification, available at https://www.bls.gov/soc/home.htm, last accessed December 6, 2023. The SOC was last updated in 2018. Standard Occupational Classification, available at https://www.bls.gov/soc/notices/2023/code_changes.htm, last accessed December 6, 2023.

[6] Courts have been critical of the equal distribution method, because "it illogically assumes that each DOT job title within an SOC code exists in equal numbers in the national economy." *Ruenger*, 23 F.4th at 762, citing *Chavez*, 895 F.3d at 966 ("The method operates on the illogical assumption that all job titles within a particular DOT job group exist in equal numbers in the national economy.").The *Chavez* court provided an illustrative example that bears repeating here: it considered a VE who determined that a claimant was able to perform one of the 24 jobs listed in DOT group 313, "Chefs and Cooks, Hotels and Restuarants." 895 F.3d at 966. Under the equal distribution method, the VE would conclude that there are approximately the same number of jobs in the national economy for a "pizza baker," DOT 313.381-014, who "prepares and bakes pizza pies," as there were for a "chef de froid," DOT 313.281-010, who designs "artistic food arrangements for buffets in formal restaurants" and whose duties encompass "mold[ing] butter into artistic forms."

manipulation occasionally but not frequently, and who could not perform forceful grasping and torquing, like twisting stuck valves. R. 111. The VE opined that such an individual could not perform Plaintiff's past work, but that such an individual could perform the positions of tanning salon attendant, DOT 359.567-014, with 2,000 jobs in the national economy; furniture-rental consultant, DOT 295.357-018, with 10,000 jobs in the national economy; and counter clerk, DOT 249.366-010,[7] with approximately 10,000 jobs in the national economy. R. 111. The VE noted that such titles were a representative, and not an exhaustive, list of the jobs that the claimant could perform, but that "there's not a lot of unskilled jobs . . . with occasional reaching, handling, and fingering." R. 111-12. The ALJ then followed up with additional questions. First, he asked the VE if the job numbers he provided were "merely estimates," and the VE confirmed that they were. R. 121. The ALJ then asked if the numbers were "conservative" or "generous." R. 121. The VE responded that he considered them to be conservative estimates. R. 121. Finally, the ALJ asked the VE if his "methods for arriving at testimony consistent with the best practices within your industry?" and the VE testified that they were. R. 121.

At the conclusion of the VE's testimony, Plaintiff's counsel objected to the VE's methodology and "the ability to substantiate these estimations based on a reliable formula or methodology." R. 122.

D.   **The ALJ's Step Five Analysis**

The ALJ found that the VE's analysis and job numbers were "persuasive," reliable, and accepted based on the VE's testimony regarding his methodology, his testimony that the numbers provided were conservative estimates, and his testimony that his methods were consistent with

---

[7] The "counter clerk" position is specifically in the photo finishing industry, and involves processing, developing, and printing film and assisting customers with film photography issues. Dictionary of Occupational Titles 249.366-010 Counter Clerk, accessed at https://admin.skilltran.com/apiDemo/index.php; last accessed December 4, 2023.

best practices in his industry. R. 29. The ALJ noted that the VE had been accepted as an expert by SSA and that the VE had "professional knowledge and experience in job placement" and had done "thousands of labor market surveys and hundreds to thousands of job analyses, involving viewing a job and providing assessments." R. 14, 29. The ALJ also noted that the VE identified his use of the DOT and the BOL statistics "with regard to job descriptions and SOC codes" and that he "described his methodology in citing jobs in the economy," in which "he will generally take a proportionate number of these jobs based on this information." *Id*. Further, the ALJ noted that the VE said that he was using "the most recent job data available;" that the job numbers given were a "representative sample" and "conservative estimates;" and that the VE said that his testimony was not in conflict with the DOT. R.14. Accordingly, the ALJ wrote that he considered and overruled each of Plaintiff's objections that were raised in pre- and post-hearing briefs and at the hearing itself. R. 14.

  **E.**   **The Court's Evaluation of the ALJ's Step Five Analysis**

As explained above, at Step Five, the burden of proof shifts to the Commissioner of Social Security to show that the claimant can adjust to other work existing in "a significant number of jobs … in the national economy." *See Brace*, 970 F.3d at 820. "[W]hen a claimant challenges a vocational expert's job-number estimate, the ALJ must inquire whether the methodology used by the expert is reliable." *Ruenger*, 23 F.4th at 761. The ALJ's conclusion that the Commissioner met that burden was not supported by substantial evidence.

In this case, as in *Ruenger,* the ALJ found the VE's testimony reliable "because [he] articulated a specific method that was based on [his] experience and consistent with the DOT." *Ruenger*, 23 F.4th at 762. But "substantial evidence requires more" than simply asking the VE "to describe his methodology. *Id.* "The ALJ must 'hold the [vocational expert] to account for the

9

reliability of [her] job number estimates." *Id*., quoting *Chavez*, 895 F.3d at 970. In this case, the Court cannot find that the ALJ did so.

### 1. The VE Testimony Regarding the Tanning Salon Attendant Position Is Not Supported By Substantial Evidence.

First, the VE's testimony regarding the tanning salon attendant job was contradictory. "When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified." SSR 00-4P, 2000 WL 1898704, at *2.

Here, Plaintiff's counsel cross-examined the VE regarding the tanning salon attendant position. The VE testified that he used numbers from 2018 which he "believe[d] is the last time this was updated." R. 114.[8] The VE described the position as "basically agreeing to customers, taking – showing them the area, explaining the services and the equipment, sell salon items, tanning sessions, schedules sessions, clean up the tanning equipment and salon. They explain the situation, and they schedule appointments." R. 114-115. The VE explained that to determine the job numbers for each position, he used

> the DOT itself, the OccuBrowser,[9] but the job numbers are done by the Bureau of Labor Statistics, and they are typically broken down by SOC codes, Standard

---

[8] Though it is not clear from the record what source the VE was looking at for this information, the DOT has not been updated since 1991. However, the SOC was updated in 2018, so presumably, the VE and Plaintiff's counsel were both referring not to the DOT, but to the SOC code for tanning salon attendant.

[9] OccuBrowse is a product of the company SkillTRAN which allows VEs and vocational counselors to access the DOT, O*NET, and other statistics using a computer database platform. OccuBrowse Basic, available at https://skilltran.com/index.php/products/pc-based-solutions/ob, last accessed December 6, 2023. The O*NET database is a web site "sponsored by the Department of Labor" and uses the SOC to "define[] the set of occupations across the world of work." O*NET OnLine Help, available at https://www.onetonline.org/help/onet/, last accessed December 6, 2023. O*NET's 2019 revision incorporated the 2018 SOC update. The O*NET-SOC Taxonomy, available at https://www.onetcenter.org/taxonomy.html, last accessed December 6, 2023. According to the Department of Labor, "The O*Net is now the primary source of occupational information." *Id.*

10

> Occupational Classification, that have a DOT. The numbers are classified. There's grouping of jobs within there, and they have varying degrees of SVPs and strengths. So typically, we'll take a proportionate number of we'll take based on the amount of different occupations that are in there . . . .

R. 117. The VE acknowledged that the equal distribution method may not be reliable because of "the issue with the job numbers and the way they're classified in the DOT is there's no way to tell specifically because of the way the reporting statistics are done as to exactly how many jobs are under that DOT at any given time." R. 119. Accordingly, he testified, "[t]hat's why I used that method and attempt to get an estimation of the number of jobs." R. 119.

The VE then turned to the tanning salon attendant job and said that he confirmed that there were "18 DOT codes within the SOC code," and that of those 18 DOT codes, approximately 12 were "light" work. R. 117-18. He then testified that he "reduced the numbers that – based on the amounts, there's only two of those occupations that I would see that would have the same SVP[10] and the same strength level as well as the use of the hands." R. 118. The total number of jobs for the total SOC group, according to the BLS, was 18,000. R. 118. The VE testified that he divided the 18,000 total jobs by nine (the number of light jobs with the SVP of 2) and arrived at 2,000, which he described as the equal distribution method. R. 118.

But the plot thickens: The title of "tanning salon attendant" does not appear in the SOC. Rather, it is cross-referenced to SOC 39.3093.00, Locker Room, Coatroom, and Dressing Room Attendants. O*NET OnLine, Locker Room, Coatroom, and Dressing Room Attendants, available at https://www.onetonline.org/crosswalk/DOT/?s=359.567-014, last accessed December 6, 2023. The DOT has an entry called "Tanning Salon Attendant," 359.567-014, but the online listing states

---

[10] SVP is the "specific vocational preparation," or the "amount of time required for a typical claimant" to learn techniques and information and develop the facility needed to perform a job. SSA POMS: DI 25001.001-77, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a77, last accessed December 19, 2023.

that "This occupational definition was prepared but not published by the U.S. Department of Labor." SkillTRAN DOT Lookup, Tanning Salon Attendant, available at https://admin.skilltran.com/apiDemo/index.php, last accessed December 6, 2023.

Courts have remanded cases where the ALJ accepted a VE's testimony that a claimant could perform a tanning salon attendant position without reconciling the inconsistency between the testimony and the absence of such a position in the DOT. *See, e.g.*, *Terry T. v. Saul*, No. 19-CV-0684-CVE-CDL, 2021 SL 981284 at *(N.D. Okla. Mar. 16, 2021) (remanding case where ALJ failed to reconcile inconsistency between DOT and VE testimony regarding tanning salon attendant job); *James S. v. Comm'r, Soc. Sec. Admin.*, No. 3:18-CV-00394-JO, 2019 WL 4345662, at *5 (D. Or. Sept. 11, 2019) (collecting cases and finding that ALJ erred when he failed to seek a clarification from the vocational expert about the tanning salon attendant occupation). The ALJ's conclusion was not supported by substantial evidence here, where the VE's testimony was flatly inconsistent with the DOT, yet the ALJ relied on the VE's professed consistency as a reason for finding the testimony reliable. "Because the ALJ and AC relied on the VE's testimony that these jobs existed (and, further, that they had the exertional and SVP characteristics that the VE represented) without any discussion of the fact that the occupation is not mentioned in the DOT, [that conclusion] is legal error." *Terry T.*, 2021 WL 981284 at *4.

Moreover, even if the VE was relying upon O*NET statistics for his conclusion that the tanning salon attendant position existed, the ALJ still failed to conduct a proper analysis. The VE testified that the tanning salon position was "light duty" with an SVP of 2, but the O*NET listing is grouped with occupations that have an SVP of 4-6 or more. *See id.*, citing Summary Report for 39-3093.00 – Locker Room, Coatroom, and Dressing Room Attendants, https://www.onetonline.org/link/summary/39-3093.00 (last accessed December 7, 2023). There

12

is simply no indication whatsoever that the ALJ considered this discrepancy, and without such a record, the ALJ cannot be said to have held the VE to account for his testimony. This record does not provide the Court with a basis, on review, to conclude that the VE's methodology was supported by substantial evidence.

Additionally, when the VE described the tanning salon attendant position, he testified that there were 18 DOT codes within the single SOC code with a total of 18,000 jobs (presumably SOC code 39.3093.00, the Locker Room, Coatroom, and Dressing Room Attendants code; but the testimony from the hearing does not make this clear). R. 117-118. He testified that of those 18 codes, 12 were light duty, and "there's only two of those occupations that I would see that would have the same SVP and the same strength level as well as the use of the hands." R. 118. He then testified that he took the 18,000 jobs and divided them by "the nine . . . light jobs with the SVP of 2," arriving at a total of 2,000 jobs available. R. 118. But the VE did not explain, nor did the ALJ inquire, how if there were only "two of those occupations" with the same SVP and strength level, why the VE divided the 18,000 jobs by nine, or how there could be nine light jobs with the SVP of 2.

Additionally, Plaintiff's counsel confronted the VE with evidence that SkillTRAN indicated that there were only 884 Tanning Salon Attendant jobs nationally. R. 120. The VE responded only that "I am familiar that SkillTRAN has some type of formula that they can utilize from their end. I don't utilize that." R. 121. The ALJ then questioned the VE on this issue but not with the necessary rigor, asking the VE whether his numbers were "conservative estimates" and "best practices." R. 121. These questions, and the VE's responses to them, do not show why the VE – and by extension, the ALJ – would have any confidence in the VE's use of the equal distribution method, as opposed to the figure in SkillTRAN. As is the case here, "[w]hat is entirely

13

lacking is any testimony from the VE explaining why he had a reasonable degree of confidence in his estimates." *Chavez*, 895 F.3d at 969.

### 2. The VE's Testimony Regarding the Furniture – Rental Clerk and the Counter Clerk Positions Is also Not Supported By Substantial Evidence.

The ALJ similarly failed to probe the VE regarding the furniture – rental clerk position after the claimant raised the issue. First, counsel questioned whether the VE was familiar with labor market studies stating that furniture – rental clerk and counter clerk were no longer jobs at the light level in the national economy. R. 112. The VE testified that he was not aware of that, and that he understood that the furniture rental clerk job "did not make the title. For some reason, the number did not make the last publication." R. 112-113. Plaintiff's counsel did not inquire what that meant, but more importantly, nor did the ALJ seek to have the VE clarify what he meant by "did not make the title," and again, the ALJ must resolve an inconsistency between the DOT and the VE's testimony before relying on the testimony. SSR 00-4P, 2000 WL 1898704, at *2  In any event, such a statement is facially at odds with the ALJ's conclusion that the VE was using up-to-date information and the best practices in the industry. Perhaps this is, in fact, the best that the industry can do – but the ALJ did not inquire about how using a job that does not exist in trusted sources can possibly be so. More rigor from the ALJ, in both the questioning and the analysis of the testimony, was required here.

Second, the VE did not provide support, nor did the ALJ require the VE to provide support, for the VE's use of the equal distribution model, and instead summarily concluded that the VE "stated that his methods of arriving at jobs in the national economy and their numbers are consistent with the best practices in his industry." R. 29. But that is a conclusion – it is not an analysis. The VE's say-so alone does not make his "method" the best practice in the industry.

14

And his method – the equal distribution method – has been routinely criticized by courts in this circuit. *Ruenger*, 23 F.4th at 764; *Chavez*, 895 F.3d at 969.

Instead, the VE testified that he used the equal distribution method to determine a number of jobs in the national economy for both the furniture – rental clerk and counter clerk positions. As with the tanning salon attendant position, he testified regarding the total number of jobs in the SOC code and then how he used the equal distribution to determine the number of positions for the tasks at hand. R. 119-121.

With regard to the position of counter clerk, the VE testified that he had observed the position being performed, including at a Target store. R. 113. The VE walked through his calculation for the counter clerk position and he testified that there were 24 occupations and the estimated group employment was 426,700. R. 119. According to the VE, he divided the 426,700 by 22, which was "approximately 20,000,"[11] and then reduced that number "in half as . . . these jobs are not done in – there's not a lot of jobs with only a light with occasional handling and fingering." R. 120. He testified that he did *not* reduce the tanning salon employment numbers by an additional fifty percent because "[i]t's my estimation of the amount of those jobs. I mean I've seen those jobs. I believe there's probably more than 2,000 nationally anyways. There's at least three tanning salons in my area of Pittsburgh which would each have at least a couple employees each." R. 120. Thus, the VE estimated that there were 10,000 of each position in the national economy. R. 120. The anecdotal nature of the VE's basis for these estimates is, at best,

---

[11] It is unclear from the record if the 22 comes from counting both the furniture rental clerk position and the counter clerk position against the 24 total jobs. The VE testified that "Twenty – I divided the 426,700 by 2 or 22 as – for counter clerk as well as the furniture rental consultant I included on these DOTs." According to O*NET, both positions are contained in the Counter and Rental Clerks SOC code 41-2021.00. Regardless, the VE did not explain why he would not divide the positions by the total number of jobs in the SOC code, nor how he arrived at these numbers.

15

questionable, further undermining any notion that the ALJ's acceptance of the VE's methodology could be supported by substantial evidence.

Plaintiff's counsel then cross-examined the VE regarding why he applied a 50 percent reduction to the numbers for the furniture – rental clerk and counter clerk positions, but not for the tanning attendant position. R. 121. The VE responded that he did so based in part on his experience of 27 years as a rehabilitation counselor and that "it's an estimation of the jobs." R. 121. He also testified that he was specifically familiar with SkillTRAN and its formula, but that he did not use it – he instead used the equal distribution method. R. 121.

In doing so, the VE failed to cite any other statistics or reasoning that would tend to show that his equal distribution numbers were reliable. Nor did he explain why it was appropriate in two cases to reduce the number of available positions by 50 percent because of his observation that there were "not a lot" of them in the national economy; but in another case to *not* reduce by an additional percentage simply because he "believe[d] there's probably more than" the number of jobs he determined using the equal distribution method. The claimant raised those issues at the hearing, but the VE failed to "cogently and thoroughly" explain them. *Ruenger*, 23 F. 4th at 762, citing *Biestek*, 139 S. Ct. at 1155. The ALJ also failed "to explain the resolution of the conflict irrespective of how the conflict was identified" before relying on the VE. SSR 00-4P, 2000 WL 1898704, at *2. In this case, the "testimony contained inconsistencies and lacked the clarity needed for the ALJ to have confidence in [his] estimates." *Ruenger*, 23 F.4th at 764. Again, we cannot conclude that the ALJ's decision based on this VE's testimony was supported by substantial evidence.

## CONCLUSION

For these reasons, the Court GRANTS the Plaintiff's memorandum seeking remand of the decision (D.E. 19).


**SO ORDERED.**

                          **ENTER:**

                          **GABRIEL A. FUENTES**
                          **United States Magistrate Judge**

**DATED: December 28, 2023**